UNITED STATES BANKRUPTCY COURT      Not for Publication
SOUTHERN DISTRICT OF NEW YORK
—————————————————————
                            :
In re:                        :       Chapter 11
                            :
ENRON CORP., *et al*.,        :       Case No. 01-16034 (AJG)
                            :
          Reorganized Debtors.    :
—————————————————————:
                            :
WESTDEUTSCHE LANDESBANK    :
GIROZENTRALE,             :
                            :
             Plaintiff,     :
                            :
     v.                   :       Adv. Pro. No. 05-3214 A
                            :
SNC-LAVALIN CONSTRUCTORS, INC., JOHN :
GILLIS, DANIEL HAAS, STEVE DANIELS,   :
MICHAEL RANZ, DAVID LUND, QUACHITA  :
POWER LLC and TPS McADAMS, LLC,    :
                            :
          Defendants.    :
—————————————————————:

OPINION GRANTING DEFENDANTS'
MOTIONS TO DISMISS ALL CLAIMS
WITH LEAVE TO REPLEAD DIRECT FRAUD CLAIMS

APPEARANCES:

NIXON PEABODY LLP
New York, New York
Counsel for Plaintiff Westdeutsche Landesbank Girozentrale

       By:     Robert C. Sentner, Esq.
                 Of Counsel

PATTERSON, BELKNAP, WEBB & TYLER LLP
New York, New York
Counsel for Defendant SNC-Lavalin Constructors, Inc.

       By:     David W, Dykhouse, Esq.
                 Of Counsel

DEWEY PEGNO & KRAMARSKY, LLP
New York, New York
Counsel for Defendant Quachita Power LLC, Inc.

By:    David S. Pegno, Esq.
Of Counsel

PADUANO & WEINTRAUB LLP
New York, New York
Counsel for Defendants John Gillis, Daniel Haas,
Steve Daniels, Michael Ranz, and David Lund

By:    Katherine B. Harrison, Esq.
Of Counsel

HUNTON & WILLIAMS, LLP
New York, New York
Counsel for Defendant TPS McAdams, LLC

By:    Brian Otero, Esq.
Of Counsel

ARTHUR J. GONZALEZ
UNITED STATES BANKRUPTCY JUDGE

The defendants in this adversary proceeding have moved to dismiss the complaint,

pursuant to Fed. R. Civ. P. 9(b), for failure to plead the fraud claims with sufficient particularity

and, pursuant to Fed. R. Civ. P. 12(b)(6), for failure to state a claim for relief. The Court finds

that the allegations of fraud are conclusory and have not been pleaded with sufficient

particularity and grants the motions to dismiss the counts that are based upon allegations of

fraud. The Court further concludes that WestLB has not stated a claim for relief with respect to

the claims based upon a theory of unjust enrichment because quasi-contractual claims are

precluded in the context of letter of credit transactions where the parties' rights and obligations

are well-defined in the relevant documents and within the framework that governs the parties'

relationship.  Therefore, the counts of the complaint based upon a theory of unjust enrichment

are dismissed.  With respect to the remaining claims for relief, WestLB has not pursued those

claims and they are also dismissed.

*Procedural Background*

Commencing on December 2, 2001, and from time to time continuing thereafter, Enron

Corporation ("Enron") and certain of its affiliated entities, including National Energy Production

Company ("NEPCO"[1] and collectively with the other debtors, the "Debtors") filed voluntary

petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy

Code").  On July 15, 2004, the Court entered an Order confirming the Debtors' Supplemental

Modified Fifth Amended Joint Plan of Affiliated Debtors (the "Plan") in these cases.  The Plan

became effective on November 17, 2004.

Westdeutsche Landesbank Girozentrale ("WestLB") filed a complaint, dated February

20, 2003 (the "Complaint"), against SNC-Lavalin Constructors, Inc.("SNC"), Quachita Power,

LLC ("Quachita"), TPS McAdams ("McAdams"), and certain officers of NEPCO (the

"Individual Defendants," and collectively with the other defendants, the "Defendants").  In the

Complaint, WestLB seeks damages for payments it alleges were wrongful draws made on letters

of credit that it issued in favor of Quachita and McAdams pursuant to agreements WestLB had

with Enron.  Specifically, WestLB alleges that McAdams, Quachita, the Individual Defendants,

and NEPCO misrepresented that the conditions for the draws had been met.  As such, WestLB

seeks damages for fraud directly against McAdams, Quachita, the Individual Defendants, as well

as against SNC as the putative successor-in-interest to NEPCO.  In addition, WestLB seeks

_____

[1]NEPCO filed its chapter 11 petition on May 20, 2002.

3

recovery against all of the Defendants based upon a theory of unjust enrichment.[2]

The Defendants filed motions to dismiss the Complaint,[3] pursuant to Fed. R. Civ. P. 9(b), for failure to state fraud with particularity and, pursuant to Fed. R. Civ. P. 12(b)(6), for failure to state a claim. The Defendants argue that WestLB has failed to state a claim for relief because the allegations in the Complaint and the contracts and agreements to which the Complaint makes reference establish, as a matter of law, that the draws on the letters of credit were warranted. In addition, SNC argues that the successor-liability claim against SNC is barred by the express terms of an order previously entered by this Court. Further, the Defendants argue that the quasi-contractual unjust enrichment claims are precluded because the subject matter of the dispute is addressed by a contract. WestLB opposed the motions for dismissal. A hearing on this matter was held before this Court on March 23, 2006.

### Standard for dismissal

FED. R. CIV. P. 12(b)(6) is incorporated into bankruptcy procedure by FED. R. BANKR. P. 7012(b). In considering a FED. R. CIV. P. 12(b)(6) motion to dismiss for failure to state a claim for relief, the court accepts as true all material facts alleged in the complaint and draws all reasonable inferences in favor of the plaintiff. *Walker v. City of New York*, 974 F.2d 293, 298

---

[2]In the Complaint, WestLB had initially sought to subrogate to any relief to which NEPCO was entitled as against McAdams and Quachita based upon NEPCO being the "applicant" on the relevant letters of credit. It appears that WestLB has not pursed that relief, perhaps because of previous rulings by this Court concerning who qualifies as an applicant on a letter of credit. *See Westdeutsche Landesbank Girozentrale v. Enron Corp.(In re Enron Corp.)*, No. 02-2009, transcript of hearing, at 12-13 (Bankr. S.D.N.Y. May 1, 2002) (concluding that Enron, and not NEPCO, was the applicant of the McAdams Letter of Credit); *See also J.P. Morgan Chase Bank v. Green Country Energy LLC (In re Enron Corp.)*, Nos. 03-8150 & 03-8151, 2006 WL 897861 at *5-6 (Bankr. S.D.N.Y. 2006) (concluding that, absent specific agreement delineating the parties' respective rights, there could be only one applicant on a letter of credit). Similarly, WestLB has not pursued its claim for relief against SNC, as successor to NEPCO, seeking reimbursement under the letters of credit.

[3]Each of the Defendants incorporate the motions of the others, to the extent applicable to their situations.

(2d Cir. 1992). The motion to dismiss is granted only if no set of facts can be established to entitle the plaintiff to relief. *Id.*

In considering such a motion, although a court accepts all the factual allegations in the complaint as true, the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 106 S. Ct. 2932, 2944 92 L. Ed. 2d 209 (1986). Thus, where more specific allegations of the complaint contradict such legal conclusions, "[g]eneral, conclusory allegations need not be credited." *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir. 1995). Rather, to withstand a motion to dismiss, there must be specific and detailed factual allegations to support the claim. *Friedl v. City of New York*, 210 F.3d 79, 85-86 (2d Cir. 2000).

"Although bald assertions and conclusions of law are insufficient, the pleading standard is nonetheless a liberal one." *Cooper v. Parsky*, 140 F.3d 433, 440 (2d Cir. 1998). Pursuant to FED. R. CIV. P. 8(a), which is made applicable to adversary proceedings by FED. R. BANKR. P. 7008, in asserting a claim, the pleader need only set forth a short and plain statement of the claim showing that the pleader is entitled to relief. The purpose of the statement is to provide "fair notice" of the claim and "the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99,103, 2 L. Ed. 2d 80 (1957). The simplicity required by the rule recognizes the ample opportunity afforded for discovery and other pre-trial procedures which permit the parties to obtain more detail as to the basis of the claim and as to the disputed facts and issues. *Id.* 355 U.S. at 47-48, 78 S. Ct. at 103. Based upon the liberal pleading standard established by FED. R. CIV. P. 8(a), even the failure to cite a statute, or to cite the correct statute, will not affect the merits of the claim. *Northrop v. Hoffman of Simsbury, Inc.*, 134 F.3d 41, 46 (2d Cir. 1997). In

5

considering a motion to dismiss, it is not the legal theory but, rather, the factual allegations that

matter. *Id.*

In reviewing a FED. R. CIV. P. 12(b)(6) motion, a court may consider the allegations in

the complaint; exhibits attached to the complaint or incorporated therein by reference; matters of

which judicial notice may be taken; *Brass v. Am. Film Technologies, Inc.*, 987 F.2d 142, 150 (2d

Cir. 1993); and documents of which plaintiff has notice and on which it relied in bringing its

claim or that are integral to its claim. *Cortec Indus. v. Sum Holding, L.P.*, 949 F.2d 42, 48 (2d

Cir. 1991). However, mere notice or possession of the document is not sufficient. *Chambers v.

Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002). Rather, a necessary prerequisite for a

court's consideration of the document is that a plaintiff relied "on the terms and effect of a

document in drafting the complaint." *Id.* As such, the document relied upon in framing the

complaint is considered to be merged into the pleading. *Id.* at 153 n.3 (citation omitted). In

contrast, when assessing the sufficiency of the complaint, a court does not consider extraneous

material because considering such would run counter to the liberal pleading standard which

requires only a short and plain statement of the claim showing entitlement to relief. *Id.* at 154.

Nevertheless, in considering a Rule 12(b)(6) motion, a court may consider facts as to which the

court may properly take judicial notice under FED. R. EVID. 201. *In re Merrill Lynch & Co., Inc.*,

273 F. Supp. 2d 351, 357 (S.D.N.Y. 2003), *citing*, *Chambers*, 282 F.3d at 153.

To survive a motion to dismiss, a plaintiff only has to allege sufficient facts, not prove

them. *Koppel v. 4987 Corp.*, 167 F.3d 125, 133 (2d Cir. 1999). A court's role in ruling on a

motion to dismiss is to evaluate the legal feasibility of the complaint, not to undertake to weigh

the evidence which may be offered to support it. *Cooper v. Parsky*, 140 F.3d 433, 440 (2d Cir.

1998).

Thus, for the purposes of the Motion to Dismiss, the Court accepts as true all of the

material allegations in the Complaint filed by WestLB.  As such, most of the following facts are

taken from the Complaint and accepted as true solely for the purposes of the motions to dismiss.

*FACTS*

NEPCO, a wholly owned subsidiary of Enron, was a construction contractor that built

power plants for various project owners.  Quachita and McAdams are each project owners and

developers of separate energy projects.  In connection with their respective energy projects,

McAdams and Quachita entered into several contracts and agreements with NEPCO and NEPCO

Power Procurement Company ("NPP"), a NEPCO affiliate.  Specifically, McAdams entered into

a Turnkey Engineering Procurement and Construction Agreement, dated as of July 11, 2000

(the"McAdams EPC Contract") with NEPCO; a Turnkey Engineering and Equipment

Procurement Agreement, dated July 31, 2001 and effective as of July 11, 2000 (the "McAdams

EEP Agreement") with NPP; and a Coordination Agreement, dated July 31, 2001 and effective

July 11, 2000 (the "McAdams Coordination Agreement") with NEPCO and NPP, each as

amended.  Under the agreements and contracts, NEPCO is referenced as the Contractor and NPP

is referred to as the Engineer.  With respect to its energy project, Quachita entered into an

Engineering and Equipment Procurement Agreement (the "Quachita EPC Contract") with

NEPCO.  (Collectively, the Quachita EPC Contract and the McAdams EPC Contract are referred

to as the "EPC Contracts").

Pursuant to both the McAdams EPC Contract and the Quachita EPC Contract, NEPCO

was permitted to provide letters of credit to the project owners in lieu of the cash retention the

7

project owners would otherwise have held back from progress payments made to NEPCO during the course of the construction.  The letters of credit provided security to the owners with respect to potential claims against NEPCO for liquidation damages.  Thereafter, two letters of credit for this purpose were obtained from WestLB.  On August 4, 2000, Enron requested that West LB establish a standby letter of credit in favor of Quachita in connection with the Quachita energy project.  In addition, Enron requested in August 2001 that WestLB establish a standby letter of credit in favor of McAdams in connection with the McAdams energy project.  In accordance with these requests, WestLB established an irrevocable standby letter of credit, dated August 4, 2000 (the "Quachita Letter of Credit"), naming Quachita as beneficiary and Enron as applicant, on behalf of NEPCO, and an irrevocable standby letter of credit, dated August 14, 2001 (the "McAdams Letter of Credit") naming McAdams as beneficiary and Enron as applicant, on behalf of NEPCO and NPP.  (Collectively, the McAdams Letter of Credit and the Quachita Letter of Credit are referred to as the "Letters of Credit").

The McAdams Letter of Credit provided that Mc Adams could draw on it upon presentation to WestLB of a certificate issued by McAdams that specified one or more of the following

> A.) [NEPCO] has failed to fulfill any or all of the conditions of the [McAdams Coordination Agreement]; and/or
> B.) [NEPCO] has failed to fulfill any or all of the conditions of the [McAdams EPC Contract] and /or
> C.) [NPP] has failed to fulfill any or all of the conditions of the [McAdams Coordination Agreement] and/or
> D.) [NPP] has failed to fulfill any or all of the conditions of the McAdams EEP Contract]. (collectively, the "Four McAdams Conditions").

The Quachita Letter of Credit provided, in relevant part, that Quachita could draw on it upon presentation of a certificate by Quachita stating that

8

> [NEPCO] has failed to perform in accordance with ( . . .insert relevant sections . . .) of the [Quachita EPC Contract] and we hereby demand payment in the amount of (. . . insert amount in figures and words . . .) Under [the Quachita Letter of Credit] according to the terms set forth and defined in the said Contract.

According to the allegations in the Complaint, the terms of the Quachita EPC Contract provided generally that the Letter of Credit could be drawn if the project owner had suffered damages due to a breach of warranty, or in the event that liquidated damages had become due and had not been paid.

The Quachita Letter of Credit was to expire on August 4, 2002 and the expiration date for the McAdams Letter of Credit was November 30, 2003. The Letters of Credit were subject to the Uniform Customs and Practice for Documentary Credits (the "UCP"), Int'l Chamber Comm., *Unif. Customs and Practice for Documentary Credits* (Pub. No. 500 1993) and, in addition, the McAdams Letter of Credit was subject to Florida law and the Quachita Letter of Credit was subject to New York law and applicable Federal law.

Enron and NEPCO had a "Cash Management System" that provided for Enron to "sweep" funds from NEPCO's bank account and maintain the funds in an Enron account. As of the end of November 2001, Enron had "swept," and at that time held, cash from NEPCO's bank accounts which project owners had paid NEPCO, and which NEPCO owed to its subcontractors and suppliers.

WestLB contends that the Individual Defendants, as members of NEPCO's management, knew that if Enron filed for bankruptcy protection, the money that had been "swept" would not be available to NEPCO to pay NEPCO's subcontractors and suppliers, thereby placing the energy projects at risk. In addition, WestLB argues that in or about November 2001, the Individual Defendants learned that Enron would soon file for bankruptcy protection. As further

alleged by WestLB, the Individual Defendants conspired to make false representations to allow

Quachita and McAdams to draw on the Letters of Credit to provide funding for the energy

projects.  WestLB also alleges that Quachita and McAdams participated in the conspiracy.

According to WestLB, the Individual Defendants put their plan into effect through false

representations made by NEPCO in a December 3, 2001 letter agreement between NEPCO and

McAdams.  The letter agreement provided as follows

> As a consequence of the failure and/or inability of Contractor and Engineer to make past, presently and prospectively due payments to Subcontractors and Vendors, Contractor and Engineer hereby acknowledge, stipulate and agree that they have not performed their obligations, in whole or in part, under the terms and provisions of the Agreement and the Contracts. Additionally, Contractor and Engineer acknowledge, stipulate and agree that they have failed to maintain in full force and effect, a parent guarantee acceptable to Owner and the Lender, in accordance with the terms and provisions of the Agreement and the Contracts.  Further, Contractor and Engineer stipulate and agree that as a consequence of such failure to perform, the letter of credit provided for in the Agreement and the Contracts may be drawn by Owner and that the proceeds from such draw may be used and applied by Owner in any manner, to any account and for any purpose which Owner may deem necessary. Contractor, Engineer, and Owner stipulate and agree that the proceeds from the draw of such letter of credit are exceeded by the damages incurred by Owner on account of and resulting form the failure of Contractor and Engineer to perform their obligations under the Agreement and the Contracts.  Contractor and Engineer hereby waives in favor of Owner and releases Owner from any rights or claims in respect of Con tractor's right to receive notice from Owner of any intent to draw down the Letter of Credit.

WestLB alleges that the December 3, 2001 letter agreement was materially false and

misleading and that McAdams was aware of that fact as it conspired with the Individual

Defendants.  Specifically, WestLB alleges that as of the date of the December 3, 2001 letter

agreement, the representations made therein were false because (1) there is no evidence that

NEPCO's subcontractors and vendors were unpaid for reasons outside the normal course of

business, (2) Enron's bankruptcy was not an event of default under the EPC Contract, and the

representation that NEPCO failed to maintain a parent guarantee acceptable to the Owner and
Lender in accordance with the terms and provisions of the EPC Contract was not a default
entitling McAdams to draw on the McAdams Letter of Credit, (3) McAdams had not at that time
suffered damages in excess of the value of the McAdams Letter of Credit, and (4) the proceeds
from the Letter of Credit, if properly applied, were to be used by McAdams to compensate it for
its damages.

On December 3, 2001, McAdams presented a sight draft to WestLB demanding a certain
payment on the McAdams Letter of Credit, as well as a certificate asserting its entitlement to
draw on the McAdams Letter of Credit based upon the Four McAdams Conditions.  On
December 4, 2001, WestLB paid McAdams the requested amount pursuant to the McAdams
Letter of Credit.  Subsequently, McAdams made additional demands under the McAdams Letter
of Credit which were also honored, resulting in the draw-down of the entire amount of the
McAdams Letter of Credit.

WestLB argues that NEPCO was not in default under the McAdams EPC Contract and
therefore, McAdams was not entitled to draw on the McAdams Letter of Credit and, therefore,
McAdams wrongfully drew on the McAdams Letter of Credit.  Further, WestLB alleges that the
Individual Defendants diverted about $1.5 million of the McAdams Letter of Credit for
themselves.

WestLB further alleges that the Individual Defendants also structured a transaction with
the purpose of transfering NEPCO's valuable assets to SNC prior to NEPCO filing for
bankruptcy protection.  In return for the assets, SNC was to pay bonuses and provide salaried
positions to the Individual Defendants, which benefits were conditioned on the successful

completion of the transaction.  The transaction, allegedly, was to transfer substantially all of

NEPCO's assets, including several EPC Contracts with various project owners as well as

employees and business opportunities, to SNC for little or no consideration.  According to

WestLB, this transaction would leave NEPCO as a shell with no assets to pay creditors, nor any

employees, contracts or future business opportunities.  Rather, the transaction was structured to

leave NEPCO with assets (the "Remaining Assets"), primarily consisting of computer

equipment, construction equipment, and office furniture, that WestLB alleges were of nominal

value.  WestLB further alleges that it was contemplated that the Remaining Assets would later be

sold with court approval once NEPCO was under bankruptcy protection.  As the Individual

Defendants were to benefit by the successful completion of the transaction, WestLB alleges that

the Individual Defendants' allegiance transferred from NEPCO to SNC during negotiations for

the transaction.  WestLB also alleges that during the negotiations for the transaction, meetings

were conducted from March through May 2002 with participation by SNC, the Individual

Defendants, other NEPCO representatives, the project owners who were party to the EPC

Contracts that SNC wanted to take over, and Enron.  As a result of these negotiations, the parties

formulated a plan whereby new EPC Contracts would be drawn up between SNC and the various

project owners.  WestLB further alleges that as a result of the income received by the project

owners from the draws on the Letters of Credit, SNC was able to negotiate better, more

profitable terms on the new EPC Contracts than would otherwise have been possible.  In

addition, according to WestLB, when the new EPC Contract became effective, SNC would

receive approximately $96 million in advance payments from the project owners.  To implement

the plan, the participating project owners issued notices terminating NEPCO's then-existing EPC

12

Contracts effective May 17, 2002. The new EPC Contracts with SNC came into effect on May 18, 2002. WestLB alleges that, as a result, effective May 18, 2002, SNC took control of, among other things, NEPCO's EPC Contracts, its management team and business opportunities. WestLB further alleges that since the consummation of the transaction, SNC has availed itself of the transferred NEPCO business opportunities and advertised itself and held itself out publicly as the continuation of the NEPCO enterprise. Thus, WestLB contends that SNC acquired all of NEPCO's valuable assets, employees and business opportunities for little or no consideration.

With respect to the Quachita Letter of Credit, WestLB alleges that NEPCO, Quachita and SNC agreed that Quachita could draw on the Quachita Letter of Credit under the pretense that the conditions for its draw were present when, in fact, that was not the case. According to WestLB, Quachita was aware that NEPCO's representation that the conditions for draw had been met was false. Rather, WestLB argues, the purpose of the draw was to permit Quachita to obtain funds to which it was not entitled from the Letter of Credit and thereby enable SNC to obtain the Quachita EPC Contract on better terms. According to WestLB, this made it even more profitable for SNC to acquire the Quachita EPC Contract and permitted SNC to make bonus payments to the Individual Defendants. Quachita premised its demand for payment from WestLB, pursuant to the Quachita Letter of Credit, upon the NEPCO and NEPCO Power's failure to fulfill conditions under the Quachita EPC Contract. Specifically, on May 23, 2002, Quachita presented a sight draft to WestLB, as well as its certificate to WestLB asserting its entitlement to draw on the Quachita Letter of Credit based upon the following

> [NEPCO] has failed to perform in accordance with Sections 6.4.1, 11.2, 14.1, 20.1, 20.7 and 29.1.1 of the [Quachita EPC Contract] and we hereby demand payment in the amount of Sixteen Million, One Hundred Forty Six Thousand, Seven Hundred Fifty United States Dollars (USD 16,146,750.00) under your

13

Standby Letter of Credit No. 22703100725WLB according to the terms set forth and defined in the said Contract.

On May 29, 2002, WestLB paid Quachita under the Letter of Credit.  Further, on May 20, 2002, the business day after the EPC Contracts were transferred to SNC, NEPCO filed for bankruptcy protection.  As previously noted, WestLB further argues that in furtherance of the parties' plan, after the transfer of all of NEPCO's valuable assets, NEPCO sought approval for sale (the "Sale") of the Remaining Assets.  Certain creditors, including WestLB objected to the Sale of the Remaining Assets to the extent that approval was sought for the pre-bankruptcy transfer of assets to SNC.  Specifically, WestLB objected to, among other things, the transfer of the EPC Contracts and future business opportunities to SNC for what it alleges was no consideration.

This Court approved the sale of the Remaining Assets for $400,000.00 in an order, dated September 5, 2002 (the "Sale Order") subject to certain conditions.  Paragraph 3[4] of the Sale Order preserved various parties' causes of action subject to the provisions of paragraph 21[5] of

---

[4]Paragraph 3 of the Sale Order provided as follows:
    Subject to the provisions of paragraph 21 below, nothing contained in this Order, including the fact that the Court approved the [Sale] Transaction, shall be deemed to impair the right of any of the Debtors, NEPCO, the NEPCO bankruptcy estate, the Creditors' Committee, the Objectors [to the Sale] and their respective permitted subrogees, successors and assigns (including to the extent permitted by the Bankruptcy Code, any chapter 7 or chapter 11 trustee appointed for NEPCO in its case under the Bankruptcy Code) to assert any claim against any party (including, but not limited to, any claims related to or arising from the events or occurrences set forth in the Objections); provided however, that this decretal paragraph (i) shall not be deemed to be a determination that any such claim exists or that any party in interest has standing or authority to pursue such a claim and (ii) shall not affect, limit or otherwise impair SNC's rights with respect to the Purchased Assets.

[5]Paragraph 21 of the Sale Order provides, in relevant part, as follows
    Except as otherwise expressly provided in the Agreement, SNC is not assuming nor shall it in any way whatsoever be liable or responsible, as a successor for any liabilities, debts commitments or obligations (whether known or unknown, disclosed or undisclosed, absolute, contingent, inchoate, fixed or otherwise) of NEPCO or its operations, or any liabilities, debts commitments or obligations in any way whatsoever relating to or airing from the Purchased Assets or NEPCO's use of the Purchased Assets on or prior to the Closing, or any such liabilities, debts, commitments or obligations that in any way whatsoever relate to the Purchased Assets during periods on or prior to the Closing are to be observed, paid discharged or performed on or prior to

the Sale Order, which provided that SNC did not assume certain NEPCO successor liabilities.

## DISCUSSION

WestLB is currently pursing two aspects of its Complaint, the direct fraud allegations against the Defendants as well as the unjust enrichment claims. With respect to the allegations of fraud, the Defendants have moved to dismiss alleging that WestLB has not stated a claim for relief. In addition, the Defendants argue that WestLB has not pled the fraud counts with sufficient particularity. The fraud counts concern alleged misrepresentations made to draw on the Letters of Credit. The McAdams Letter of Credit is governed by Florida law and the Quachita Letter of Credit is governed by New York law. Under New York law, the elements required to establish a common law fraud claim include a material false representation, intent to defraud, and reasonable reliance on the representation causing damage to the aggrieved party. *Turtur v. Rothschild Registry Int'l, Inc.*, 26 F.3d 304, 310 (2d Cir. 1994). Under Florida law, the elements for actionable fraud are (1) a false statement concerning a material fact, (2) knowledge by the person making the statement that the representation is false, (3) the intent by the person making the statement that the representation will induce another to act on it, and (4) reliance on the representation to the injury of the other party. *Lance v. Wade*, 457 So.2d 1008, 1011 (Fla. 1984). Thus, the elements require an intentional material misrepresentation upon which the other party relies to his detriment. *Id*.

### Pleading fraud with particularity

---

the Closing (in each case, including any liabilities that result from, relate to or arise out of tort or other product liability claims), or any such liabilities calculable by reference to NEPCO or its assets or operations, or relating to continuing conditions existing on or prior to the Closing, which liabilities, debts commitments and obligations are hereby extinguished insofar as they may give rise to successor liability, without regard to whether the claimant asserting any such liabilities, debts, commitments or obligations has delivered to SNC a release thereof. . . .

Fed. R. Civ. P. 9(b), which is entitled Fraud, Mistake, Condition of the Mind and which
is incorporated into bankruptcy practice by Fed. R. Bankr. P. 7009, provides that

> In all averments of fraud or mistake, the circumstances constituting fraud or
> mistake shall be stated with particularity.  Malice, intent, knowledge, and other
> condition of mind of a person may be averred generally.

FED. R. CIV. P. 9(b).

The Fed. R. Civ. P. 9(b) requirements of pleading fraud with particularity apply to claims
of intentional fraud.  *Pereira v. Equitable Life Ins. Society (In re Trace Int'l Holdings, Inc.)*, 289
B.R. 548, 557 (Bankr. S.D.N.Y. 2003).  The particularity required by Fed. R. Civ. P. 9(b),
however, must be viewed in the context of "the liberal notice-pleading requirement" of Fed. R.
Civ. P. 8.[6]  *In re Olympia Brewing Co. Securities Litigation*, 674 F.Supp. 597, 619 (N.D. Ill.
1987).

The fraud allegations must specify the time, place, speaker, and content of the alleged
misrepresentation.  *DiVittorio v.  Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir.
1987).  Pursuant to the express terms of Fed. R. Civ. P. 9(b), a party's requisite mental state, or
scienter, may be pleaded generally.  Fed. R. Civ. P. 9(b).  Nevertheless, as the purposes of Fed.
R. Civ. P. 9(b) are to give fair notice to a defendant of the claim to enable it to prepare its
defense, to protect the defendant's reputation and good will from ill-considered charges of
misconduct, and to protect the defendant from strike suits, the relaxation of the specificity

---

[6]Fed. R. Civ. P. 8, incorporated into bankruptcy practice by Fed. R. Bankr. P. 7008 provides, in relevant
part, as follows:
> (a) Claims for Relief.  A pleading which sets forth a claim for relief . . . shall contain . . . (2) a
> short and plain statement of the claim showing that the pleader is entitled to relief . . . .
> . . .
> (e) Pleading to be Concise and Direct; Consistency.
> > (1) Each averment of a pleading shall be simple, concise, and direct.  No
> > technical forms of pleading or motions are required.

16

requirement for scienter is not to be viewed as permission to base fraud claims "on speculation and conclusory allegations." *Shields v. Citytrust BanCorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir. 1994) (citations omitted).  Rather, to further the purposes of Fed. R. Civ. P. 9(b), despite the reduced pleading standard for scienter, plaintiffs are required "to allege facts that give rise to a strong inference of fraudulent intent."  *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001).  A plaintiff can sufficiently allege intent (a) by alleging that a defendant had both motive and opportunity to commit fraud or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.  *Id.*  To sufficiently plead motive, the plaintiff must allege that a defendant benefitted in a concrete and personal way from the purported fraud.  *Id.*  In instances where motive is not apparent, "the strength of the circumstantial allegations must be correspondingly greater."  *Powers v. British Vita, P.L.C.*, 57 F.3d 176, 184 (2d Cir. 1995).

As previously noted, one of the major functions of Fed. R. Civ. P. 9(b) is to give adequate notice of the claim to the adverse party to allow it to prepare its defense.  As a result, fraud allegations cannot be based upon "information and belief" except in instances where the opposing party is in control of the facts or the facts are peculiarly within the knowledge of the opposing party.  *In re Manhattan Investment Fund Ltd.*, 310 B.R. 500, 505 (Bankr. S.D.N.Y. 2002).  And when based upon information and belief, the complainant must set forth the facts upon which the belief is based.  *DiVittorio*, 822 F.2d at 1247.

The Defendants argue that WestLB has not stated a claim for relief because the conditions for a draw under the Letters of Credit were met and, therefore, there were no misrepresentations made upon which to base fraud allegations.  In addition, McAdams argues

17

that the direct fraud claim against it fails to sufficiently plead a fraud claim for relief because in its certification requesting payment on the McAdams Letter of Credit, McAdams asserted four separate, independently-valid basis entitling it to receive payment.  According to McAdams, however, WestLB has only alleged that one of those representations was fraudulent.  Therefore, McAdams argues that, even if it were true that the contested representation were fraudulent, McAdams had three other independent basis upon which it was entitled to draw on the McAdams Letter of Credit that have not been challenged.  Inasmuch as McAdams was justified in drawing if any one of the four conditions were met, McAdams argues that WestLB cannot establish, based upon the allegations in the Complaint, the required element under Florida law of detrimental reliance.  Quachita contends that WestLB has not specified the basis of its alleged fraud claims, that is, whether it is based upon a theory of common law fraud or based upon a statute, the UCC.  According to Quachita, pleading fraud allegations under the UCC must meet a more stringent standard.  However, Quachita also asserts that WestLB does not sufficiently allege fraud even under the standard applicable to common law fraud.

Under Florida law, which governs the McAdams Letter of Credit, WestLB must allege detrimental reliance on the misrepresentation.  However, there is no detrimental reliance where a party would have been required to act in the same way absent the misrepresentation.  *Riccard v. Prudential Ins. Co.*, 307 F.3d 1277, 1290 (11th Cir. 2002).  Thus, because WestLB has not sufficiently pled that McAdams' three other representations - any one of which would have entitled McAdams to draw on the Letter of Credit - were fraudulent, WestLB's direct fraud claim against McAdams is properly dismissed as not having been pled with sufficient particularity.

The Quachita Letter of Credit is governed by New York law which requires an allegation

18

of intent to defraud.  To assert a direct fraud claim against Quachita, WestLB must allege facts

that give rise to a strong inference of fraudulent intent.  *Kalnit v. Eichler*, 264 F.3d at 138.  The

allegations must assert that a defendant had both motive and opportunity to commit fraud or

include facts that constitute strong circumstantial evidence of conscious misbehavior or

recklessness.  *Id.*  Further, to sufficiently plead motive requires an allegation that a defendant

benefitted in a concrete and personal way from the purported fraud.  WestLB asserts that its

alleges Quachita's intent by alleging that

> The draw on the Quachita Letter of Credit was to enable SNC to take over the
> EPC Contact on a highly profitable basis, which, in turn, would result in the
> [Individual Defendants] receiving [certain benefits] from SNC, and for Quachita
> to obtain funds to which it was not entitled under the terms of the Quachita EPC
> Contract and [the Quachita] Letter of Credit.

While the allegations plead a concrete benefit to SNC and the Individual Defendants, there is no

allegation of any concrete benefit for Quachita.  Rather, while WestLB asserts that Quachita

obtained funds to which it was not entitled under the Quachita Letter of Credit, the allegations

further detail how the arrangement provided for those funds to be turned over to SNC for the

purpose of allowing SNC to both obtain a windfall and to pay over a portion of those funds, in

the form of bonuses, to the Individual Defendants.  Indeed, the Complaint specifies that the

Defendants "formulated and executed a scheme which would accomplish SNC's and [the

Individual Defendants'] goals."  WestLB further alleges in the Complaint that the draws on the

Letters of Credit made it possible for SNC to get a more profitable and less risky deal on the

EPC contracts it entered into with the project owners.  There are further allegations that pursuant

to the arrangement reached, SNC would receive advance payments and would generally realize a

windfall.  There are, however, no allegations of concrete benefit to Quachita.  The only benefit

19

one might discern would be that Quachita would ensure completion of its construction projects. However, this conclusion would undercut WestLB's basic premise that there were no defaults under the EPC Contracts and no basis upon which to draw on the Letters of Credit. Indeed, WestLB alleges in the Complaint that various of the projects in issue were well on the way to completion, including the Quachita project which was 90% complete in May 2002. WestLB further alleges that the project owners, like McAdams and Quachita, "did not wish to terminate the NEPCO EPC Contracts at that stage in the projects." Thus, the allegations in the Complaint basically set forth that the funds allegedly wrongfully obtained by Quachita were for the purpose of diverting them to benefit SNC and the Individual Defendants with no discernable benefit for Quachita.

There are not sufficient allegations that Quachita had a motive to commit fraud, nor are there allegations of facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. To the contrary, the Complaint sets forth the details of the Debtors' cash management system whereby Enron swept the funds in NEPCO's account, including funds that Quachita had paid to NEPCO that were intended for subcontractors and suppliers. The Complaint further alleges that the Defendants were aware that once Enron filed for bankruptcy, the funds would not be available for their intended purpose thereby placing the construction projects at risk. Thus, rather than setting forth details of conscious misbehavior or recklessness, the Complaint sets forth a basis to support Quachita's election to draw on the Quachita Letter of Credit to ensure the completion of its project. Therefore, in the Complaint, WestLB has not sufficiently pled facts that allege a strong inference of fraudulent intent and the direct fraud claim against Quachita is not pled with sufficient particularity.

20

Based upon the foregoing, the Court is dismissing the counts of the Complaint alleging fraud as against Mc Adams and Quachita.  WestLB, however, is afforded an opportunity to replead these fraud claims.

The allegations of fraud against SNC and the Individual Defendants are premised upon the viability of the wrongful draw allegations against McAdams and Quachita.  Thus, if the draws were warranted, the claims fail.  As the Court is dismissing the Complaint as against McAdams and Quachita, the fraud allegations against SNC and the Individual Defendants are also properly dismissed on that basis alone.  As the Court has afforded WestLB an opportunity to replead the fraud claims against McAdams and Quachita, if WestLB decides to replead those claims, WestLB may renew its fraud claims as against SNC[7] and the Individual Defendants, at which time the Court will address the other basis upon which the Defendants seek dismissal.

*Unjust enrichment claims*

The claims for relief seeking recovery based upon a theory of unjust enrichment are also dismissed.  Under New York and Florida law, the existence of a valid contract precludes recovery in quasi-contract for events arising out of the same subject matter.  *Valley Juice Ltd., Inc. v. Evian Waters of France, Inc*., 87 F.3d 604, 610 (2nd Cir. 1996); *Webster v. Royal Caribbean Cruises, Ltd.*, 124 F.Supp.2d 1317, 1326 (S.D. Fla. 2000).  This rule applies even in instances where "one party to the lawsuit is not a party to the contract."  *Augienello v. Coast-to-*

---

[7]If WestLB elects to replead its fraud claim as against SNC, it must articulate why such a claim would not be susceptible to dismissal as being a claim that belongs to the estate.  It appears that any claim sought against a purchaser of a debtor's assets for successor liability based upon a fraudulent purchase of a debtor's assets would be in direct competition with any claim that could be brought by such debtor's estate to recover the value of any such fraudulently transferred assets.  Thus, there remains the issue of whether such claim has vested in the debtor's estate requiring a creditor to establish standing to assert the successor liability action.  Therefore, WestLB must establish its standing to bring any such action.

*Coast Financial Corp.*, No. 01 Civ. 11608 (RWS), 2002 WL 18229264 *6 (S.D.N.Y. Aug. 7, 2002).

This Court has previously ruled that because the rights and obligations of parties to a letter of credit transaction are well-defined as set forth in the four corners of the relevant documents and "because the parties knowingly conduct their relationship pursuant to a statutory framework concerning letter of credit law that fills in any gaps, an action for unjust enrichment is not available" in the letter of credit context. *See J.P. Morgan Chase Bank v. Green Country Energy LLC (In re Enron Corp.)*, Nos. 03-8150 & 03-8151, 2006 WL 897861 at *7 (Bankr. S.D.N.Y. 2006). WestLB argues that although a quasi-contract claim is not available if there is a contract covering the same subject matter, courts have permitted the pleading of a quasi-contract claim as an alternative theory. Courts, however, have only permitted the alternate pleading of a quasi-contractual claim in instances where there is an actual dispute as to the existence of a contract, not where it is acknowledged that a contract exists and the dispute centers on the obligations under such contract. *See Augienello*, 2002 WL 18229264 at *6; *Webster*, 124 F.Supp.2d at 1326. Here, there is no dispute as to the existence of the Letters of Credit and that they are enforceable pursuant to their terms and subject to the UCP and relevant state law. Therefore, quasi-contractual claims such as unjust enrichment are not available.

*Conclusion*

WestLB has not pursued the claims in the Complaint based upon its alleged subrogation to the rights of NEPCO as putative applicant or its rights to reimbursement from NEPCO as putative applicant. Therefore, those claims are dismissed. The fraud claims in the Complaint have not been pleaded with sufficient particularity and therefore are properly dismissed. With

respect to the unjust enrichment claims, WestLB has not stated a claim to relief because quasi-contractual claims are barred in the context of these letter of credit transactions where the terms of the relevant documents and framework of the parties' relationship cover the subject matter of the dispute.  Therefore, the unjust enrichment claims are properly dismissed.

Finally, WestLB is granted leave to replead solely the direct fraud claims as against the Defendants.  WestLB is afforded 60 days within which to file any such amended pleading.

Counsel for McAdams and Quachita are to settle an order consistent with this Opinion.


Dated: New York, New York
       June 30, 2006

                                   **s/Arthur J. Gonzalez**
                                   UNITED STATES BANKRUPTCY JUDGE