UNITED STATES BANKRUPTCY COURT   For Publication
SOUTHERN DISTRICT OF NEW YORK
———————————————————————
              :
In re             :   Chapter 11
              :
ENRON CORP., *et al.*,      :   Case No. 01-16034 (AJG)
              :   Confirmed Cases
       Reorganized Debtors. :
———————————————————————:
              :
WESTLB AG NEW YORK BRANCH, :
              :
       Plaintiff,   :
              :
    v.         :   Adv. Pro. No. 05-3214 (AJG)
              :
TPS McADAMS, LLC, and    :
QUACHITA POWER, LLC,    :
              :
       Defendants.  :
———————————————————————:

## OPINION REGARDING MOTIONS BY DEFENDANTS TPS McADAMS, LLC AND QUACHITA POWER, LLC TO DISMISS AMENDED COMPLAINT

A P P E A R A N C E S

HUGHES HUBBARD & REED LLP
New York, New York
Attorneys for Plaintiff WestLB AG New York Branch

   David W. Wiltenburg, Esq.
   Christopher K. Kiplok, Esq.

DEWEY PEGNO & KRAMARSKY LLP
New York, New York
Attorneys for Defendant Quachita Power, LLC

   David S. Pegno, Esq.
   Keara A. Bergin, Esq.
   Debbie Klein, Esq.

HUNTON & WILLIAMS LLP

New York, New York
Attorneys for TPS McAdams, LLC

       Brain V. Otero, Esq.
       Stephen R. Blacklocks, Esq.

ARTHUR J. GONZALEZ
UNITED STATES BANKRUPTCY JUDGE


       Commencing on December 2, 2001 (the "Petition Date"), and from time to time

continuing thereafter, Enron Corp. ("Enron") and its affiliates, (collectively, and together with

Enron, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the

United States Code (the "Bankruptcy Code").  On July 15, 2004, the Court entered an Order (the

"Confirmation Order") confirming the Debtors' Supplemental Modified Fifth Amended Joint

Plan of Affiliated Debtors (the "Plan") in these cases.  The Plan became effective on November

17, 2004 (the "Effective Date).

       WestLB AG New York Branch ("WestLB") is a branch of a joint stock company under

the laws of the Federal Republic of Germany (and successor in interest to Wesdeutsche

Landesbank Girozentale ("Westdeutsche"), a public law banking institution organized under the

laws of North Rhine-Westphalia, Federal Republic of Germany), and is duly authorized to

conduct business in, among other places, New York.

       Defendant TPS McAdams, LLC ("McAdams") is a limited liability company organized

under the laws of the state of Delaware, and its principal place of business is in Tampa, Florida.

Defendant Quachita Power, LLC ("Quachita") is a limited liability company organized under the

laws of the State of Delaware, and its principal place of business is in Charlotte, North Carolina

Westdeutsche commenced this adversary proceeding against several defendants, including McAdams and Quachita by filing a complaint, dated February 20, 2003, in the District Court for the Southern District of New York.[1]   The defendants all moved to dismiss the complaint and certain defendants moved to refer the matter from the district court to this Court. The district court concluded that the matter was related to the Enron bankruptcy case pending before this Court and, by order dated October 13, 2005, granted the motions to refer this proceeding to this Court.   As a result, the Court considered the motions to dismiss that had been filed in the adversary proceeding and for the reasons stated in its Opinion Granting Defendants' Motions to Dismiss all Claims with Leave to Replead Direct Fraud Claims, dated June 30, 2006, the Court concluded that the motions to dismiss should be granted;   however, it also determined that WestLB should be granted leave to replead its direct fraud claims.   An Order to that effect was entered on July 14, 2006 (the "July 14 Order").   Subsequently, on August 21, 2006, the Court entered a Modification Concerning Opinion Granting Defendants' Motions to Dismiss all Claims with Leave to Replead Direct Fraud Claims, in which the Court made a modification to its June 30 opinion.   The modification concerned the first claim for relief in the Complaint, which the Court had previously treated as abandoned by Westdeutsche.   However, upon Westdeutsche's assertion that it had not abandoned the claim for relief, the Court dismissed it on the merits.   In addition, the Court granted Westdeutsche's request to modify the pleadings to reflect Westdeutsche's name change to WestLB AG.   Thereafter, on August 30, 2006, an order (the "August 30 Order") was entered dismissing the complaint and granting WestLB AG leave to file an amended complaint for the purpose of repleading only its direct fraud claims as against

---

[1]The additional defendants were SNC-Lavalin Contractors, Inc. ("SNC") and several individual defendants, who were executives of SNC and formerly members of management of an Enron subsidiary.

the defendants.  In addition, the August 30 Order directed that the pleadings reflect plaintiff's name change to WestLB AG.

WestLB[2] filed an amended complaint, dated October 30, 2006 (the "Amended Complaint"),[3] against McAdams and Quachita (together, the "Defendants"), in which, as in the original complaint, it alleges that it suffered damages as a result of Defendants' improper draw on certain letters of credit.  WestLB seeks to recover the funds that the Defendants allegedly wrongfully obtained by retaining the proceeds of the letters of credit.

Specifically, WestLB alleges that McAdams and Quachita both wrongfully drew on WestLB's letters of credit, in the sums of $22,643,013 and $16,146,750 respectively, by misrepresenting that conditions for the draws had been met when they had not, and by failing to account for use of the draw proceeds and return overdrawn amounts to WestLB.  WestLB seeks to recover the sums, plus interest and net of other recoveries, that McAdams and Quachita retained from those draws.  In the Amended Complaint, WestLB seeks recovery both in its own right as issuer and as subrogee to Enron, as applicant.

WestLB alleges that it is entitled to damages based upon principles of common law fraud. In addition, WestLB argues that it is entitled to damages for breaches of warranty owed by a beneficiary of a letter of credit to the issuer under the Uniform Commercial Code ("UCC") - in the case of McAdams applying the Florida UCC and in the case of Quachita applying the New York UCC.  Additionally, it alleges that it is entitled to subrogate to Enron's rights as applicant

---

[2]The August 30 Order granted the request to correct the pleadings to reflect the plaintiff as WestLB AG. The amended complaint, however, was filed by WestLB AG New York Branch.

[3]The amended complaint names only McAdams and Quachita as defendants; therefore, WestLB is not pursuing claims against the formerly-named defendants, SNC and the individual defendants.

4

for the letters of credit and assert the warranty rights owed, after honor, to Enron by the beneficiary of each letter of credit.

On December 15, 2006, McAdams and Quachita, each filed a motion to dismiss the Amended Complaint. McAdams argues that WestLB's claims should be dismissed because the Amended Complaint and documents integral to the plaintiff's claims show that the draws on the McAdams Letter of Credit were warranted. Alternatively, the Defendants argue that WestLB's fraud claims should be dismissed because they are legally defective. In addition, the Defendants argue that WestLB's claims as subrogee of Enron should be dismissed because the subrogation claims are legally deficient. The Defendants also argue that the subrogation claims were asserted contrary to the August 30 Order allowing WestLB to file an amended complaint repleading its direct claims for fraud. The Defendants also argue that the common law claims should be dismissed because, among other reasons, they are inconsistent with the UCC remedy scheme.

*Motion to Dismiss Standard*

FED. R. CIV. P. 12(b)(6) is incorporated into bankruptcy procedure by FED. R. BANKR. P. 7012(b). In considering a FED. R. CIV. P. 12(b)(6) motion to dismiss for failure to state a claim for relief, the court accepts as true all material facts alleged in the complaint and draws all reasonable inferences in favor of the plaintiff. *Walker v. City of New York*, 974 F.2d 293, 298 (2d Cir. 1992). The motion to dismiss is granted only if no set of facts can be established to entitle the plaintiff to relief. *Id*.

In considering such a motion, although a court accepts all the factual allegations in the complaint as true, the court is "not bound to accept as true a legal conclusion couched as a

5

factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 106 S. Ct. 2932, 2944 92 L. Ed. 2d

209 (1986).  Thus, where more specific allegations of the complaint contradict such legal

conclusions, "[g]eneral, conclusory allegations need not be credited."  *Hirsch v. Arthur Andersen*

*& Co.*, 72 F.3d 1085, 1092 (2d Cir. 1995).  Rather, to withstand a motion to dismiss, there must

be specific and detailed factual allegations to support the claim.  *Friedl v. City of New York*, 210

F.3d 79, 85-86 (2d Cir. 2000).

"Although bald assertions and conclusions of law are insufficient, the pleading standard

is nonetheless a liberal one."  *Cooper v. Parsky*, 140 F.3d 433, 440 (2d Cir. 1998).  Pursuant to

FED. R. CIV. P. 8(a), which is made applicable to adversary proceedings by FED. R. BANKR. P.

7008, in asserting a claim, the pleader need only set forth a short and plain statement of the claim

showing that the pleader is entitled to relief.  The purpose of the statement is to provide "fair

notice" of the claim and "the grounds upon which it rests."  *Conley v. Gibson*, 355 U.S. 41, 47,

78 S. Ct. 99,103, 2 L. Ed. 2d 80 (1957).  The simplicity required by the rule recognizes the

ample opportunity afforded for discovery and other pre-trial procedures, which permit the parties

to obtain more detail as to the basis of the claim and as to the disputed facts and issues.  *Id.* 355

U.S. at 47-48, 78 S. Ct. at 103.  Based upon the liberal pleading standard established by FED. R.

CIV. P. 8(a), even the failure to cite a statute, or to cite the correct statute, will not affect the

merits of the claim.  *Northrop v. Hoffman of Simsbury, Inc.*, 134 F.3d 41, 46 (2d Cir. 1997).  In

considering a motion to dismiss, it is not the legal theory but, rather, the factual allegations that

matter.  *Id.*

In reviewing a FED. R. CIV. P. 12(b)(6) motion, a court may consider the allegations in

the complaint; exhibits attached to the complaint or incorporated therein by reference; matters of

6

which judicial notice may be taken, *Brass v. Am. Film Technologies, Inc.*, 987 F.2d 142, 150 (2d

Cir. 1993); and documents of which plaintiff has notice and on which it relied in bringing its

claim or that are integral to its claim. *Cortec Indus. v. Sum Holding, L.P.*, 949 F.2d 42, 48 (2d

Cir. 1991). However, mere notice or possession of the document is not sufficient. *Chambers v.

Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002). Rather, a necessary prerequisite for a

court's consideration of the document is that a plaintiff relied "on the terms and effect of a

document in drafting the complaint." *Id*. As such, the document relied upon in framing the

complaint is considered to be merged into the pleading. *Id*. at 153 n.3 (citation omitted). In

contrast, when assessing the sufficiency of the complaint, a court does not consider extraneous

material because considering such would run counter to the liberal pleading standard which

requires only a short and plain statement of the claim showing entitlement to relief. *Id*. at 154.

Nevertheless, in considering a Rule 12(b)(6) motion, a court may consider facts as to which the

court may properly take judicial notice under FED. R. EVID. 201. *In re Merrill Lynch & Co., Inc.*,

273 F. Supp. 2d 351, 357 (S.D.N.Y. 2003), *citing*, *Chambers*, 282 F.3d at 153.

To survive a motion to dismiss, a plaintiff only has to allege sufficient facts, not prove

them. *Koppel v. 4987 Corp.*, 167 F.3d 125, 133 (2d Cir. 1999). A court's role in ruling on a

motion to dismiss is to evaluate the legal feasibility of the complaint, not to undertake to weigh

the evidence which may be offered to support it. *Cooper v. Parsky*, 140 F.3d 433, 440 (2d Cir.

1998). Thus, for the purposes of the Motion to Dismiss, the Court accepts as true all of the

material allegations, that are not legal conclusions, in the Amended Complaint filed by WestLB.

*FACTS*

National Energy Production Company ("NEPCO"), a wholly owned subsidiary of Enron,

7

was a construction contractor that was in the business of building power plants.  McAdams and

Quachita are each project owners and developers of separate energy projects.  In connection with

their respective energy projects, McAdams and Quachita entered into several contracts and

agreements with NEPCO and NEPCO Power Procurement Company ("NPP"), a NEPCO

affiliate, under which NEPCO and NPP would engineer, procure and construct a power plant for

each.  Specifically, McAdams entered into a Turnkey Engineering Procurement and Construction

Agreement, dated as of July 11, 2000 (the "McAdams EPC Contract"), with NEPCO; a Turnkey

Engineering and Equipment Procurement Agreement, dated July 31, 2001, and effective as of

July 11, 2000 (the "McAdams EEP Agreement"), with NPP; and a Coordination Agreement,

dated July 31, 2001, and effective July 11, 2000 (the "McAdams Coordination Agreement," and

together with the McAdams EPC Contract and the McAdams EEP Agreement, the "McAdams

Contracts"), with NEPCO and NPP, each as amended.  Under the McAdams Contracts, NEPCO

is referenced as the Contractor and NPP is referred to as the Engineer.  With respect to its energy

project, Quachita entered into an Engineering and Equipment Procurement Agreement (the

"Quachita EPC Contract") with NEPCO.  (Collectively, the Quachita EPC Contract and the

McAdams Contracts are referred to as the "Construction Contracts").

The Construction Contracts provided for progress payments to be made by the owners of

the projects to NEPCO upon the completion of certain milestone events.  A payment schedule

tied to those milestone events was attached as an exhibit to each Construction Contract.  To

ensure satisfactory completion of the contractor's obligations, the Construction Contracts called

for the cash retention by the owner of 10% of the amount payable (the "Retainage") at each

milestone event.  It was contemplated that the Retainage would be paid over to the contractor

8

upon the satisfactory completion of the project.  The Construction Contracts were "frontloaded" in that Quachita and McAdams paid NEPCO and NPP more early in the course of the contract to ensure that NEPCO and NPP would be able to purchase equipment, pay subcontractors, and other expenses without NEPCO or NPP having to advance their own funds.

Pursuant to the Construction Contracts, NEPCO was permitted to provide letters of credit to the project owners in lieu of the Retainage that the project owners would otherwise have held back from progress payments made to NEPCO during the course of the construction.  Thereafter, two letters of credit for this purpose were obtained from WestLB.  On August 4, 2000, Enron requested that West LB establish a standby letter of credit in favor of Quachita in connection with the Quachita energy project.  In addition, Enron requested in August 2001 that WestLB establish a standby letter of credit in favor of McAdams in connection with the McAdams energy project.  In accordance with these requests, WestLB established an irrevocable standby letter of credit, dated August 4, 2000 (the "Quachita Letter of Credit"), naming Quachita as beneficiary and Enron as applicant, on behalf of NEPCO, and an irrevocable standby letter of credit, dated August 14, 2001 (the "McAdams Letter of Credit"), naming McAdams as beneficiary and Enron as applicant, on behalf of NEPCO and NPP.  (Collectively, the McAdams Letter of Credit and the Quachita Letter of Credit are referred to as the "Letters of Credit").

The McAdams Letter of Credit provided that McAdams could draw on it upon presentation to WestLB of a certificate issued by McAdams that specified one or more of the following

> A.) [NEPCO] has failed to fulfill any or all of the conditions of the [McAdams Coordination Agreement]; and/or
> B.) [NEPCO] has failed to fulfill any or all of the conditions of the [McAdams EPC Contract]; and /or

C.) [NPP] has failed to fulfill any or all of the conditions of the [McAdams Coordination Agreement]; and/or

D.) [NPP] has failed to fulfill any or all of the conditions of the McAdams EEP Contract]. (collectively, the "Four McAdams Conditions").

The Quachita Letter of Credit provided, in relevant part, that Quachita could draw on it upon presentation of a certificate by Quachita stating that

[NEPCO] has failed to perform in accordance with ( . . . insert relevant sections . . . ) of the [Quachita EPC Contract] and we hereby demand payment in the amount of ( . . . insert amount in figures and words . . . ).  Under [the Quachita Letter of Credit] according to the terms set forth and defined in the said Contract.

The Quachita Letter of Credit was to expire on August 4, 2002, and the expiration date for the McAdams Letter of Credit was November 30, 2003.  The Letters of Credit were subject to the Uniform Customs and Practice for Documentary Credits (the "UCP"),  Int'l Chamber Comm., *Unif. Customs and Practice for Documentary Credits* (Pub. No. 500 1993) and, in addition, the McAdams Letter of Credit was subject to Florida law and the Quachita Letter of Credit was subject to New York law and applicable Federal law.

As it was acquired to substitute for Retainage, the available amount under the McAdams Letter of Credit increased over time, in correlation with the amounts due from McAdams to NEPCO under the McAdams EPC Contract.  This was intended to allow the amount available under the McAdams Letter of Credit to approximate 10% of the progress payments due from McAdams to NEPCO.  In addition, the McAdams Letter of Credit provided for partial draws. With the Letters of Credit in place, Quachita and McAdams regularly made payments for the timely performance of contract milestones on the construction projects.  At the time of Enron's bankruptcy filing, substantially all of NEPCO's cash was held in the name of Enron (the "Swept Cash").

10

WestLB alleges that upon learning that Enron, but not NEPCO or NPP, would be filing a bankruptcy petition and upon realizing that Enron's filing was not considered an event of default under the McAdams Contracts, McAdams nevertheless determined to misrepresent its entitlement to draw on the McAdams Letter of Credit to WestLB to induce it to honor the draw. According to WestLB, the plan was implemented with the parties first agreeing to amend the McAdams Contracts to provide for direct payments by McAdams to suppliers and subcontractors in lieu of milestone payments to NEPCO and NPP. WestLB contends that this amendment would eliminate or minimize the risk of future performance defaults arising from the bankruptcy of Enron, in that no funds needed to pay for the project would ever come under the control of Enron. WestLB alleges that this agreement would not be memorialized, but would be kept secret until the fraud against WestLB had been carried out. WestLB further alleges that the plan also provided that within hours following the bankruptcy filing of Enron, NPP would falsely recite in a letter to McAdams that defaults had occurred due to NEPCO's cash having been swept by Enron preceding the Enron bankruptcy filing. On December 3, 2001, NPP wrote a letter to McAdams stating that

> Procurement confirms it is unable to make payment to its Subcontractors due to a lack of available cash on hand for such payments, resulting from the cash sweep of our funds under the Contractor Parent Company's centralized cash management system and the recent bankruptcy filing by the Contractor Parent Company. We acknowledge that McAdams has previously made payment to NEPCO, and that NEPCO has received such payments, for the purpose of our making payments to our Subcontractors. The amount of such payments to our Subcontractors is in excess of the amount available for draw under the Letter of Credit provided pursuant to the Coordination Agreement and the Contracts. Additionally, we acknowledge that your damages far exceed the amount available for draw under the Letter of Credit and that Procurement has no interest (now or in the future with respect to such funds drawn or to be drawn pursuant to the Letter of Credit.

11

In addition, Procurement acknowledges and agrees that it has failed to satisfy its implied covenant to maintain in full force and effect a guarantee from Enron Corp. Capable of providing credit enhancement to Procurement's obligations hereunder.

Procurement acknowledges that the Coordination Agreement is the Coordination Agreement by and among Procurement, McAdams, and NEPCO dated August ___, but effective as of July 11, 2000, set forth in the letter of credit no. 22703100891 from Westdeutsche Landesbank (the "Letter of Credit"). Additionally, the EEP Contract is the Turnkey Engineering and Equipment Procurement Agreement by and between TPS McAdams, LLC and NEPCO Power Procurement, dated August ___, 2001, but effective as of July 11, 2000, referenced in the Letter of Credit.

On December 3, 2001, NEPCO and McAdams entered into a letter agreement (the

"Letter Agreement").  The Letter Agreement provided as follows

As a consequence of the failure and/or inability of Contractor and Engineer to make past, presently and prospectively due payments to Subcontractors and Vendors, Contractor and Engineer hereby acknowledge, stipulate and agree that they have not performed their obligations, in whole or in part, under the terms and provisions of the Agreement and the Contracts. Additionally, Contractor and Engineer acknowledge, stipulate and agree that they have failed to maintain in full force and effect, a parent guarantee acceptable to Owner and the Lender, in accordance with the terms and provisions of the Agreement and the Contracts.  Further, Contractor and Engineer stipulate and agree that as a consequence of such failure to perform, the letter of credit provided for in the Agreement and the Contracts may be drawn by Owner and that the proceeds from such draw may be used and applied by Owner in any manner, to any account and for any purpose which Owner may deem necessary. Contractor, Engineer, and Owner stipulate and agree that the proceeds from the draw of such letter of credit are exceeded by the damages incurred by Owner on account of and resulting form the failure of Contractor and Engineer to perform their obligations under the Agreement and the Contracts.  Contractor and Engineer hereby waives in favor of Owner and releases Owner from any rights or claims in respect of Contractor's right to receive notice from Owner of any intent to draw down the Letter of Credit.

WestLB alleges that the December 3, 2001 Letter Agreement was materially false and

misleading and that McAdams was aware of that fact.  WestLB argues that the Letter Agreement

was designed to assist McAdams in carrying out the fraud against WestLB and included a waiver

of NEPCO's right to notice of default and opportunity to cure.

      WestLB alleges that there had not been a default by NEPCO and NPP and the parties knew that the project was "cash neutral" and that they had already secretly agreed to terms which rendered the Swept Cash even less necessary to continue funding the project. On December 3, 2001, McAdams presented a sight draft to WestLB demanding a certain payment on the McAdams Letter of Credit, as well as a certificate asserting its entitlement to draw on the McAdams Letter of Credit based upon the Four McAdams Conditions. On December 14, 2001, WestLB paid McAdams the requested amount pursuant to the McAdams Letter of Credit, which was the maximum amount it could draw at the time. Subsequently, McAdams made additional demands against the McAdams Letter of Credit which were also honored, resulting in the draw-down of the entire amount of the McAdams Letter of Credit.

      WestLB further alleges that, after the first demand for payment against the McAdams Letter of Credit, NEPCO and McAdams finally executed their secret agreement that McAdams would make direct payments to suppliers and others. WestLB contends that the amendment to the McAdams Contracts recited non-existing defaults and allowed McAdams to pay NEPCO and NPP subcontractors, suppliers, vendors and other costs directly, and to limit any further profit NEPCO and NPP would be entitled to under the McAdams Contracts. WestLB maintains that thereafter, the agreement was announced and the parties issued press releases commenting on how the bankruptcy of Enron would not impact the timely completion of the projects. WestLB argues that the amendment took the risk of default away from NEPCO and NPP and transferred it to McAdams. WestLB contends that by McAdams paying the project costs directly, there could not be a default by NEPCO or NPP under the McAdams Contracts and, therefore, the

conditions for the draws could not be met.  WestLB argues that because NEPCO was not in

default under the McAdams Contracts, McAdams was not entitled to draw on the McAdams

Letter of Credit and, therefore, McAdams wrongfully drew on the McAdams Letter of Credit.

   With respect to the Quachita Letter of Credit, WestLB alleges that NEPCO and Quachita

agreed that Quachita could draw on the Quachita Letter of Credit under the pretense that the

conditions for its draw were present when, in fact, that was not the case.  According to WestLB,

Quachita was aware that NEPCO's representation that the conditions for draw had been met was

false.  Rather, WestLB argues, the purpose of the draw was to permit Quachita to obtain funds to

which it was not entitled from the Letter of Credit.  Quachita premised its demand for payment

from WestLB, pursuant to the Quachita Letter of Credit, upon the NEPCO and NEPCO Power's

failure to fulfill conditions under the Quachita EPC Contract.  Specifically, on May 23, 2002,

Quachita presented a sight draft to WestLB, as well as its certificate to WestLB asserting its

entitlement to draw on the Quachita Letter of Credit based upon the following

> [NEPCO] has failed to perform in accordance with Sections 6.4.1, 11.2, 14.1,
> 20.1, 20.7 and 29.1.1 of the [Quachita EPC Contract] and we hereby demand
> payment in the amount of Sixteen Million, One Hundred Forty Six Thousand,
> Seven Hundred Fifty United States Dollars (USD 16,146,750.00) under your
> Standby Letter of Credit No. 22703100725WLB according to the terms set forth
> and defined in the said Contract.

On May 29, 2002, WestLB paid Quachita under the Letter of Credit.  On May 20, 2002,

NEPCO filed for bankruptcy protection.

   WestLB argues that Quachita knew the conditions for draw had not been met because of

certain amendments to the Quachita EPC Contracts that Quachita and NEPCO had entered.

WestLB alleges that the amendments to the Quachita EPC Contract eliminated or minimized the

risk of future performance defaults.  WestLB alleges that on December 1, 2001, Quachita and

14

NEPCO entered into Amendment No.1 and Restated Amendment No. 1 to the Quachita EPC Contract (the "First Quachita Amendment"), pursuant to which Quachita would pay NEPCO's subcontractors and other costs directly.  Thereafter, Quachita and NEPCO entered into two other amendments to the Quachita EPC Contract on December 3, and December 8, 2001, assigning certain responsibility for subcontracts directly to Quachita (the "Subsequent Quachita Amendments," collectively with the First Quachita Amendment, the "Quachita Amendments"). WestLB argues that the Quachita Amendments transferred the risk of defaults from NEPCO to Quachita.

On May 14, 2002, NEPCO and SNC entered into an asset purchase agreement pursuant to which NEPCO agreed to sell SNC certain assets and property.  On May 20, 2002, NEPCO filed a petition for relief under chapter 11 of the Bankruptcy Code.  On May 21, 2002, NEPCO filed a motion for approval of the sale of the NEPCO assets to SNC.  Two days later, as previously noted, Quachita made its demand on WestLB to draw on the Quachita Letter of Credit premised upon NEPCO's failure to fulfill conditions under the Quachita EPC Contract and, on May 29, 2002, WestLB honored Quachita's demand for payment by paying it the maximum amount it could draw under Quachita Letter of Credit.

## DISCUSSION

The various counts of the Amended Complaint are premised upon the draws being unjustified.  Thus, if the draws were warranted, the Amended Complaint must be dismissed.  The Letters of Credit set forth the terms pursuant to which the respective beneficiary could draw on them.

McAdams argues that all of WestLB's claims should be dismissed because the Amended

Complaint and documents integral to WestLB's claims show that the draws by McAdams on the McAdams Letter of Credit were warranted.  McAdams maintains that if one or more of the conditions for the draw were met, McAdams's statement that the conditions were met cannot have been false or fraudulent.  Quachita also argues that the conditions for its draw on the Quachita Letter of Credit were met and that because its certificate was not false, the draw was warranted.

WestLB argues that the McAdams Letter of Credit required that there be an actual default under the terms of the McAdams Contracts before McAdams could draw on the McAdams Letter of Credit.  WestLB alleges that there were no defaults at the time of the draw.  WestLB further argues that there could not be a future default with respect to the payment of suppliers and subcontractors because most of the frontloaded milestone payments had been made and the schedule of milestone payments due from McAdams to NEPCO and NPP made the project "cash neutral" as the milestone payments were timed to coincide with NEPCO's and NPP's obligations to pay suppliers and subcontractors.  WestLB also argues that there was no threat that NEPCO would default or fail to fulfill a condition concerning the payment of suppliers and subcontractors in the future because the parties had agreed in advance that NEPCO no longer had the obligation to pay these parties as McAdams had taken on the responsibility of paying them directly.

McAdams counters that to be entitled to draw on the McAdams Letter of Credit, McAdams was not required to certify that a default had occurred.  McAdams maintains that, instead, McAdams was only required to certify that NEPCO or NPP had failed to fulfill "any or all conditions" of the McAdams Contracts.  McAdams further argues that one of the conditions

16

of the McAdams EPC Contract was that NEPCO provide "sufficient material, equipment, services [and] labor to timely perform the Work" and if NEPCO "fails, neglects, refuses or is unable at any time during the course of performance of the Work" to provide such material, equipment, services or labor, McAdams is entitled to terminate the contract. McAdams argues that if NEPCO were "unable at any time" to pay subcontractors or vendors, it would be a "failure of any or all of the conditions" in the McAdams EPC Contract entitling McAdams to draw on the McAdams Letter of Credit. McAdams argues that WestLB's recognition of the fact that substantially all of NEPCO's cash had been swept and held by Enron shows that McAdams did not have cash and therefore was "unable" to pay its subcontractors and suppliers.

The McAdams Letter of Credit provides that McAdams could draw on it upon presentation to WestLB of a certificate issued by McAdams that specified that NEPCO or NPP had "failed to fulfill any or all of the conditions" of any of the McAdams Contracts. WestLB argues that the use of the term "condition" by McAdams is merely semantic because all of the contract sections referenced deal with defaults. However, rather than derogating from the argument advanced by McAdams, this reference merely reinforces that the parties utilized the term "default" when that is what they intended. Ordinarily, a court interprets the plain meaning of a contract as evidenced by the terms used by the parties. While most regard letters of credit as "unique commercial instruments," nevertheless, it is acknowledged that traditional contract principles apply to the extent that they do "not interfere with the unique nature of credits." *Kools v. Citibank*, 872 F.Supp. 67, 70 (S.D.N.Y. 1996) (citing, John F. Dolan, THE LAW OF LETTERS OF CREDIT §2.02 at 2-5 (2d ed. 1990) (other citations omitted). Thus, although a letter of credit is not considered a contract, nevertheless, it is a relationship that, like a contract, has well defined

rights and obligations. *J.P. Morgan Chase Bank v. Green Country Energy, LLC (In re Enron Corp.)*, Nos. 03-8150 & 03-8151, 2006 WL 897861 at *7 (Bankr. S.D.N.Y. 2006). Moreover, applying the plain meaning contract interpretation principle will not interfere with a letter of credit's unique nature. Thus, with respect to a letter of credit transaction, the parties' rights are determined from the "wording of the letter of credit itself." *Barclay's Bank PLC v. Dresdner Bank Lateinamerika, A.G. (In re Lancaster Steel Co.)*, 284 B.R. 152, 159 (S.D. Fla 2002). The plain reading of the McAdams Letter of Credit does not include a requirement that there be a default prior to a draw. Rather, it merely requires that McAdams certify that NEPCO or NPP has failed to fulfill a condition of any of the McAdams Contracts.

Moreover, the softer standard applied to trigger the right to draw on the McAdams Letter of Credit is logical in the context of its functioning as a substitute for the Retainage and considering the purpose of retainage. The retention of a percentage of a contractor's monthly progress payments, known as retainage, secures the payment of performance-related damages. Gary S. Wigmore, Credit Documentation For Project Finance Transactions, 605 PLI/Comm 235, 268 (March 2-3, 1992). The retainage is a means of ensuring the satisfactory completion of a construction project as it functions as an incentive for its timely and acceptable completion. David N. Powers, Selected Issues Regarding Construction And Operation And Maintenance Contracts, 749 PLI/Comm 143, 151 (February 1997). The purpose of retainage is "to avoid a situation in which 'costs' to the contractor to complete the facility are less than 'benefits', i.e., final payment." *Id.* On the date of final completion, the contractor will receive the amount retained, usually with interest, after certain other adjustments. Wigmore, Credit Documentation For Project Finance Transactions 605 PLI/Comm at 268-269.

18

Alternatively, in certain instances, contractors are afforded the opportunity to obtain letters of credit as a substitute for their retainage obligations. *Id*. at 269.

As previously noted, the Letters of Credit were obtained to substitute for the Retainage required under the Construction Contracts. The Letters of Credit were required to be in an amount equal to the Retainage. Absent the Letters of Credit, McAdams and Quachita would have had possession of the 10% Retainage at the time Enron filed its bankruptcy petition.

Moreover, if there was a failure to perform any condition, the McAdams Letter of Credit allowed McAdams to recoup the entire amount of Retainage that would otherwise then have been due at the time of a particular milestone payment regardless of the condition that NEPCO or NPP failed to perform. Thus, whether or not the failure of a condition would impede the timely completion of the project, and the extent of any impediment, was irrelevant to the amount that could be drawn. Rather, the amount was tied to the schedule of milestone payments. WestLB could have restricted draws on the McAdams Letter of Credit to amounts reasonably necessary to secure performance by NEPCO or NPP or, alternatively, WestLB could have secured additional collateral. *See Lancaster Steel Co.*, 284 B.R. at 161. Other than the percentage link to the milestone payment, there were no limitations in the Letters of Credit on the amount of the draw once a triggering event occurred. If any such limitation had been intended, it would have been included by sophisticated parties. *See Lancaster Steel Co.*, 284 at. 161 (noting that parties to letters of credit are generally sophisticated). There is no question that the parties to these arrangements are sophisticated. Thus, the fact that the payment schedule was "frontloaded" or that the payment flow from McAdams to NEPCO to the subcontractors was cash neutral is irrelevant because once it was established that NEPCO or NPP failed to fulfill a

19

condition of the McAdams Contracts, the terms of the Letter of Credit permitted a draw that was tied to the payment schedule.

The same rationale applies to the alleged secret agreement reached by NEPCO, NPP and McAdams for future payments to subcontractors and suppliers to flow directly from McAdams to the subcontractors and suppliers and to bypass NEPCO and NPP, thereby avoiding any future interference, related to NEPCO's financial condition, with the completion of the project.  While any such agreement may have avoided such hindrance, it did not eliminate the fact that the trigger for the draw on the McAdams Letter of Credit occurred when either NEPCO and NPP was unable to fulfill any condition under the McAdams Contracts.  Further, the only limitation on the draw was based upon the percentage link to the milestone payment.

Here, McAdams was permitted to hold the Retainage until substantial completion of the construction project.  The McAdams Letter of Credit was intended to substitute for the Retainage and McAdams was entitled to draw on the McAdams Letter of Credit once a triggering event occurred.  Therefore, by drawing on the McAdams Letter of Credit for the full amount to which it was entitled, McAdams was protecting itself until substantial completion of the construction project.  Its draw was reasonable and certainly not fraudulent.

The same analysis applies to the Quachita Letter of Credit.  Quachita was entitled to draw on the Quachita Letter of Credit if NEPCO was not in compliance with the Quachita Contract.  Quachita asserts that NEPCO was not in compliance with the project schedule as the plant was not completed on schedule but, rather, two months after the scheduled completion date.  Therefore, Quachita asserts that it was entitled to draw against its liquidated damage claim.  Further Quachita argues that NEPCO was not in compliance with the Quachita Contract because

20

NEPCO had no funds to pay subcontractors and suppliers or other debts when due, as a result of Enron having swept NEPCO's cash pre-petition and Enron's filing a bankruptcy petition which prevented Enron from returning funds to NEPCO. Without funds, Quachita could not pay debts when due.

Moreover, the Court does not agree with WestLB's argument that the pre-filing plan was a fraudulent scheme. Rather, the plan, as alleged, actually reflects the Defendants' recognition of the business realities concerning their rights to draw on the respective Letters of Credit in the context of the consequences of a bankruptcy filing by Enron, which would result in Enron retaining any cash that it had swept from its subsidiaries - leaving NEPCO and NPP without funds. The premise of WestLB's argument is that the Defendants knew that Enron was preparing to file for bankruptcy protection but that, at that time, neither NEPCO nor NPP would be filing for bankruptcy protection. According to WestLB, because Enron's filing was not a trigger for a right to draw on the Letters of Credit, the parties arranged for the Defendants to take on the responsibility from NEPCO and NPP to pay the subcontractors and suppliers. NEPCO and NPP would then profess that they could not meet their obligations to subcontractors and suppliers, thereby affording the Defendants the opportunity to draw on their respective Letter of Credit. However, the basis for the assertion by NEPCO and NPP that they could not meet their obligations was the fact that they lacked cash because Enron had swept their cash pre-petition and Enron's bankruptcy filing prevented the cash from being returned to, or available to, NEPCO or NPP. Even if the agreement were contemplated prior to the filing, it did not alter the fact that once Enron swept the cash of NEPCO and NPP and then filed for bankruptcy, those entities would lack funds to pay subcontractors and suppliers or other debts. Therefore, whether

the Defendants' agreements to take on the responsibility of paying subcontractors and suppliers, and bypass NEPCO and NPP, were entered into prior to Enron filing for bankruptcy or after is irrelevant. Inasmuch as the providers of services were not parties to them, the agreements that NEPCO and NPP entered into with the Defendants did not absolve NEPCO or NPP from their debt obligations which, without funds, they were not able to pay. Rather, the agreements were applied to ensure that subcontractors and suppliers were paid on a timely basis. The arrangement merely ensured a smooth transition.

The Defendants bargained for the Letters of Credit which were intended to backstop NEPCO. Instead, they took on NEPCO's responsibility and determined to backstop themselves. By doing so, they did not lose the right to use the Letters of Credit for that purpose. WestLB bargained for NEPCO to continue to be able to pay its bills and when it could not, WestLB had to pay and look to Enron for payment. That is what happened. There was no fraud because there was no duty or misrepresentation. NEPCO could not pay its debts, whether that debt was to a subcontractor - or to the Defendants if the Defendants paid a subcontractor. The agreement was completely consistent with the intent and the risk assumed by the parties. The Letters of Credit were obtained in lieu of the Retainage and were intended to provide the Defendants with the protection afforded by retainage, including providing security for the completion of the project and with respect to potential claims against NEPCO for liquidation damages. The Defendants agreed that if NEPCO or NPP became unable to pay their debts, the Defendants would get the benefit of the "substitute" Retainage by drawing on the Letters of Credit. That was consistent with the purpose of retainage, which is supposed to insulate the owner from having to go out of pocket to pay the claims of subcontractors and suppliers. WestLB agreed that if NEPCO and

NPP were unable to pay its debts, it would look to Enron to reimburse it for the draw.

The Court concludes that, even accepting all of the facts alleged by WestLB as true, the draws by McAdams and Quachita on their respective Letters of Credit were warranted and there was not any fraud. The trigger for the draw by McAdams was that NEPCO and NPP were "unable" at the time of Enron's bankruptcy filing, which was "during the course of performance of the Work," to provide "sufficient material, equipment, services [and] labor to timely perform the Work." Without funds, NEPCO and NPP were "unable" to provide these items. The Quachita Contract required NEPCO to pay its debts as they came due. Again without funds, Quachita could not pay its debts as they came due.

Having eliminated certain allegations contained in the original complaint concerning the effects of Enron's "Cash Management System" on NEPCO's ability to pay suppliers and subcontractors, WestLB argues that there remains an evidentiary issue that precludes dismissal of the Amended Complaint. Specifically, WestLB contends that there is the possibility that, at the time of the draws, no amounts were due to any subcontractors or suppliers and that NEPCO and NPP would have been entitled to future milestone payments that would have provided them with the wherewithal to pay any future accruing debts, including those to subcontractors and suppliers. The Court will address that argument after addressing its alternate basis for dismissing the subrogation claims.

The claims based upon WestLB's alleged right to subrogate to the rights of Enron, as applicant, are dismissed for an additional reason. WestLB's right to file an Amended Complaint repleading its claims against the Defendants emanates from the Court's August 30 Order, which was limited to repleading direct fraud claims. As the subrogation claims are not within the

23

Court's grant under the August 30 Order, WestLB must meet the standards for leave to amend its

pleadings. Fed. R. Civ. P. 15(a) requires that leave to amend a pleading be freely given. *Foman*

*v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962).  However, a court will not

allow an amendment of a pleading if there has been undue delay, bad faith or dilatory motive in

proposing the amendment, if there has been repeated failure to cure the deficient pleading in

previous amendments, if there would be undue prejudice to the opponent in allowing the

amendment, or if the amendment would be futile.  *Id.*

In its original complaint, WestLB alleged that Enron and NEPCO had a "Cash

Management System" that provided for Enron to "sweep" funds from NEPCO's bank account

and maintain the funds in an Enron account.  WestLB further alleged that as of the end of

November 2001, Enron had "swept," and at that time held, cash from NEPCO's bank accounts

which project owners had paid NEPCO, and which NEPCO owed to its subcontractors and

suppliers.  WestLB alleged that the Defendants were aware that once Enron filed for bankruptcy,

the funds would not be available for their intended purpose - including paying subcontractors

and suppliers - thereby placing the construction projects at risk.  Thus, these allegations would

defeat WestLB's claims as it establishes that NEPCO was not able to pay its subcontractors and

suppliers.  This is because Enron had swept the funds which project owners had paid NEPCO

which were intended for and owed to subcontractors and suppliers and once Enron filed for

bankruptcy those funds would not be returned to NEPCO.  NEPCO merely became a pre-petition

creditor of Enron without the ability to access those funds, and, according to the allegations in

the original complaint, a portion of those funds were already owed to subcontractors and

suppliers.

24

WestLB argues that the amended complaint supersedes the original complaint and any admission in the original complaint that is omitted from the amended complaint merely becomes an evidentiary issue for trial but cannot be considered on a Fed. R. Civ. P. 12(b)(6) motion to dismiss.

Although "an amended complaint ordinarily supersedes the original, and renders it of no legal effect," *see Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994), a court may refuse to allow an amendment where, by omitting allegations from the previously filed complaint, the plaintiff seeks to "erase" admissions that are contained in it. *Austin v. Ford Models, Inc.*, 149 F.3d 148, 155 (2d Cir. 1998). The party seeking to amend a complaint to omit an allegation that defeats its claim for relief must present a legitimate explanation for its previous inclusion, such as it having been the result of mistake or inadvertence.

Here, WestLB does not assert that the original allegations concerning the result of the Swept Cash were inaccurate. Rather, it merely seeks to manipulate the pleading by omitting the allegations that defeat its claim because the allegations establish that the Defendants were justified in drawing on the Letter of Credit. WestLB has not provided a legitimate explanation for having previously included the allegations it now seeks to omit. The Court denies WestLB's request for leave to amend the complaint to assert the subrogation claims as any such amendment would be futile because the Court would not permit WestLB to omit its previous admissions without an adequate explanation. Further, including those admissions as part of the Amended Complaint defeats the claims for relief based upon subrogation to Enron's rights.[4]

---

[4]In addition, without seeking leave to amend to add the subrogation claim to its complaint, WestLB asserted the claim in derogation of the Court's August 30 Order, which only permitted the repleading of direct fraud claims. Moreover, even if the inclusion of the claim in the Amended Complaint were construed as an implied request for leave to amend the complaint to add the subrogation claims, the Court finds that there was undue delay in making

Turning to the putative evidentiary issue concerning whether NEPCO and NPP had cash flow sufficient to pay subcontractors or suppliers, the Court applies the same rationale that it applied to the motion for leave to amend the pleadings to add the subrogation claims. Applying that standard, the Court dismisses the other claims for relief in the Amended Complaint. The Court notes that when it granted WestLB leave to replead its direct fraud claims, it afforded WestLB the opportunity to supplement the pleadings to specify whether the other conditions asserted by McAdams for its draw had been met and, also, the particular benefit that it alleged was received by Quachita.[5] Instead, having failed to supplement its pleading to establish these elements, WestLB attempts to "erase" certain admissions that have a dispositive effect in defeating the relief it seeks. In that effort, however, WestLB does not state that such previous admissions were inaccurate. Rather, it seeks to distance itself from those disadvantageous admissions by omitting them.

Indeed, had the Court been presented with the proposed amended complaint, in the

---

such request. The Court issued its decision dismissing WestLB's original complaint on June 30, 2006. Thereafter, WestLB sought modification of certain determinations reached by the Court in the decision. However, at that time, no request was made for leave to amend the pleading to add the subrogation claims. Nor was any such request made during the additional proceedings conducted before the Court to address the requested modification. WestLB asserts that its decision to add the subrogation claims was based upon this Court's determination that Enron and, not NEPCO, was the applicant on the Letters of Credit. WestLB also references a ruling in another matter concerning a similar issuer of letters of credit who was permitted to pursue a subrogation claim to Enron's rights as applicant of its letter of credit. However, the decision it relies upon was rendered in February 2006, which was not only issued before the Court addressed the modification request but even before the Court rendered its June 30, 2006 ruling dismissing the original complaint in this matter. Moreover, a proposed order, in this matter, containing the restriction was circulated after the June 30, 2006 ruling and WestLB did not object to the restriction limiting any amended pleading to direct fraud claims. Thus, the Court additionally denies the request to amend the complaint to add the subrogation claims because there was undue delay in making the request.

[5]The Court dismissed the original complaint as against McAdams because the allegations of the complaint would not establish detrimental reliance as required by Florida law inasmuch as McAdams had asserted four independent basis upon which to draw upon the letter of credit and WestLB had only challenged one of them. The original complaint was dismissed as against Quachita because the allegations in the complaint would not establish a concrete benefit to Quachita. At that time, the Court noted that it would reach the issues raised in the Defendants' additional arguments to dismiss the complaint if WestLB elected to replead addressing the identified deficiencies.

context of a motion seeking leave to amend, it would not have granted leave for WestLB to omit the previous admissions without legitimate explanation.  A different result should not obtain merely because the Court allowed the complaint to be amended as part of its determination to dismiss the previous complaint which, by necessity, occurred prior to the Court having an opportunity to review the Amended Complaint.  Thus, the inclusion of those admissions defeats all of WestLB's claims for relief.  Therefore, all of the claims against McAdams and Quachita are dismissed.

## CONCLUSION

The draws on the Letters of Credit by McAdams and Quachita were warranted.  WestLB has not proffered an adequate explanation to omit the dispositive allegations contained in the original complaint.  As those allegations would defeat the proposed subrogation claims for relief, WestLB's request for leave to amend the complaint to include the subrogation claims is denied, as futile.  In addition, because those allegations would also defeat all of the other claims for relief, all of the claims for relief should be dismissed.  Therefore, the Amended Complaint is properly dismissed.

The Defendants are to settle an order consistent with this opinion.


Dated: New York, New York
       July 9, 2007

                                        s/Arthur J. Gonzalez
                                        UNITED STATES BANKRUPTCY JUDGE

27